# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| META PLATFORMS, INC., a Delaware corporation, and CHIME FINANCIAL, INC., a Delaware corporation, | CASE NO.:  4:22-cv-00803-DMR<br>*Hon. Donna M. Ryu* |
| Plaintiffs, | **[PROPOSED] JUDGMENT AND PERMANENT INJUNCTION** |
| v. | |
| ARAFAT ENIOLA AROWOKOKO (aka ENNY HORLAR DC) and AROWOKOKO AFEEZ OPEYEMI (aka CLASSIC RG LEKKI SPENDER aka RG LEKKI aka ABDUL AFEEZ OPEYEMI), | Complaint Filed:  February 8, 2022<br>Trial Date:   TBD |
| Defendants. | |

Before the Court is the Motion for Default Judgment filed by Plaintiffs Meta Platforms, Inc. ("Meta") and Chime Financial, Inc. ("Chime") (collectively, "Plaintiffs") on January 18, 2023 (the "Motion"). The Motion was properly noticed for hearing on February 23, 2023.

Upon consideration of all filings in connection with the Motion, as well as all pleadings, the Court rules as follows:

## I.    FINDINGS OF FACT

### A.    Plaintiff Meta

1.    Facebook is a social networking website and mobile application that enables its users to create their own personal profiles and connect with each other on their personal computers and mobile devices.  Complaint ("Compl.") ¶ 17.

2.    Instagram is a photo and video sharing service, mobile application, and social network that, among other things, allows users to send and receive direct messages to and from other users.  *Id.* ¶ 18.

3.    All Facebook users agree to Facebook's Terms of Service ("Facebook TOS") and other rules that govern access to and use of Facebook, which also include the Facebook Community Standards.  *Id.* ¶ 20.

4.      Similarly, all Instagram users agree to the Instagram Terms of Use ("Instagram TOU") and to other rules that govern access to and use of Instagram, including the Instagram Community Guidelines (the Instagram TOU together with the Instagram Community Guidelines, the Facebook TOS and the Facebook Community Standards, are collectively referred to hereafter as the "Meta Terms").  *Id.* ¶ 21.

5.      At all times relevant to this action, Plaintiff Meta Platforms, Inc. (formerly known as Facebook, Inc.) has operated Facebook and Instagram.  Since April 2018, the Instagram TOU has stated that the Instagram TOU constitute an agreement between Instagram users and Facebook Inc., now known as Meta.  Compl. ¶ 19.

6.      With respect to the Facebook TOS, Section 3.1 requires users to "[u]se the same name that [they] use in everyday life," "[p]rovide accurate information about [them]self," "[c]reate only one account ([their]) own)" and use that account "for personal purposes," and prohibits users from using Facebook if Meta "previously disabled [a user's] account for violations of [the TOS] or [Facebook] Policies."  Compl. ¶ 22; Declaration of Michael Duffey ("Duffey Decl.") ¶ 7, Exs. 1-4.

7.      Section 3.2.1 prohibits users from: (a) doing anything "unlawful, misleading, [] or fraudulent"; (b) doing anything that "infringes or violates someone else's rights, including their intellectual property rights"; and (c) "violat[ing] [the Facebook TOS], [Facebook] Community Standards, and other Terms and Policies that apply to [a user's] use of Facebook."  Compl. ¶ 23; Duffey Decl. ¶ 7, Exs. 1-4.

8.      The Facebook Community Standards expressly prohibit "deceiving others to generate a financial or personal benefit to the detriment of a third party or entity through . . . financial scams."  Compl. ¶ 24; Duffey Decl. ¶ 8, Exs. 5-12. The Community Standards further prohibit users from "impersonat[ing] others by . . . creating an account assuming to be or speak for another person or entity."  Duffey Decl. ¶ 9, Exs. 13-17.

9.      As for the Instagram TOU, those terms prohibit users from (a) "do[ing] anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose"; (b) "do[ing] anything that violates someone else's rights, including intellectual property"; (c) "attempt[ing] to create accounts or access or collect information in unauthorized ways," "includ[ing] creating accounts or

collecting information in an automated way without our express permission"; (d) "violat[ing] . . . [Instagram] Terms or [Instagram] policies"; and (e) using Instagram if Meta "previously disabled your account for violation of law or any of [Instagram's] policies." *Id.* ¶ 25; Duffey Decl. ¶ 10, Exs. 18-20.

10.     The Instagram Community Guidelines prohibit "impersonat[ing] others and . . . creat[ing] accounts for the purposes of violating our guidelines or misleading others."  Compl. ¶ 26; Duffey Decl. ¶ 11, Exs. 21-30.

11.     In addition to prohibiting Facebook and Instagram users from impersonating others and from posting content that infringes third parties' intellectual property rights or is otherwise unlawful, Meta also has a variety of measures and tools in place to help businesses facing harm on its platforms.  Compl. ¶ 27.

12.     For example, Meta also makes available dedicated communication channels for rights holders to report posts or other user-generated content they believe to infringe their intellectual property rights, including dedicated reporting forms for trademark violations.  *Id* ¶ 29. Meta reviews these reports and, if a report is complete and valid, removes the reported content.  *Id.* Meta also notifies both the reporter and the violating user of the fact of and reason for the removal. *Id.*  Meta also makes available dedicated channels for persons to report impersonating accounts and Pages.  *Id.*

**B.     <u>Plaintiff Chime</u>**

13.     Chime is a fintech company that delivers financial technology products and services to its members, including offering various options for opening savings and spending accounts, allowing customers to utilize a CHIME-branded payment card in partnership with Visa, and offering a mobile app to allow customers to manage their finances, transfer money and track spending.  Compl. ¶ 30.

14.     Websites, mobile applications, and/or technology platforms offered, operated or made available by Chime are governed by the Chime Terms of Use ("TOU").  The Chime TOU contains a forum selection clause whereby Defendants submit to the personal jurisdiction of this Court.  *Id.* ¶ 13.

15.     Since 2014, Chime has consistently and exclusively offered its products and services under the CHIME brand and has engaged in extensive advertising and promotion of its products and services in connection with the CHIME brand, logo and trademarks (collectively, the "Chime Marks").  *Id.* ¶¶ 32-33.

16.     Chime's extensive advertising and promotion, and its development and provision of innovative, trustworthy and secure products and services in the fintech space, have resulted in the Chime Marks being recognizable to the public as exclusively denoting Chime as the source of the products and services offered under the Chime Marks.  *Id.* ¶ 34.

17.     The Chime Marks have acquired substantial goodwill and strong secondary meaning and are valuable assets of Chime, affording Chime strong common law rights in its marks.  *Id.*

18.     Chime also owns Federal Trademark Registration Nos. 4,728,805 and 6,053,385 and pending Application Nos. 90/906,784 and 90/906,790 for the Chime Marks.  *Id.* ¶ 34-36.  Each registration is in full force and effect and provides prima facie evidence of Chime's exclusive use, ownership and validity of each such registration, and Registration No. 4,728,805 for CHIME in Classes 9 and 36 has been acknowledged as incontestable under Section 15 of the Lanham Act, which provides conclusive evidence of Chime's right to exclusive use, ownership and validity of the mark.  *Id.* ¶¶ 35-36.

19.     Chime utilizes brand enforcement services and protection tools to monitor and take down infringing use of the Chime marks on social media and the broader web, and partners directly with registrars to engage in takedown initiatives.  *Id.* ¶¶ 39-40.

20.     Chime also closely monitors use of its website, mobile applications and technology platforms for suspicious activity, takes measures to investigate and address unauthorized access to member accounts, and provides its account holders with tools to report suspicious activity and dispute unauthorized transactions.  *Id.* ¶ 41.

**C.     <u>Relevant Conduct by Defendants</u>**

21.     Since at least March 2020, Defendants Arafat Eniola Arowokoko and Arowokoko Afeez Opeyemihave (collectively, "Defendants") used a network of Facebook and Instagram

accounts to impersonate Chime and lure Instagram users to Chime-branded phishing websites, in violation of the Meta Terms.  *Id.* ¶¶ 44, 49.

22.     To conceal their scheme, Defendants used a shared network of computers to control at least five Facebook accounts and more than 800 Instagram accounts, in violation of Facebook's Terms of Service and Instagram's Terms of Use.  Compl. ¶¶ 2, 7, 11-13, 20-26, 48.  Many of these accounts used the Chime logo as their profile photo and the word "Chime" with varied spellings in the username, such as "_ch_im_e_" and "chime942," intended to escape Plaintiffs' enforcement efforts.  *Id.* ¶ 48

23.     The Chime-branded phishing websites also used, without authorization, the Chime Marks—including the Chime logo and the word mark "Chime"—and images taken from Chime's official website, purportedly to offer online banking services.  *Id.* ¶¶ 45-46.  These phishing websites prompted visitors to provide their Chime login information (email and password), which Plaintiffs believe the Defendants then used to withdraw money from their Chime accounts.  *Id.*

24.     Chime has not authorized or licensed Defendants' use of its intellectual property, including but not limited to the Chime Marks.  *Id.* ¶ 47.

25.     Beginning no later than March 2020, Defendants accepted and were bound by the Meta Terms. Defendants created and used multiple Facebook and Instagram accounts and thereby agreed to the Facebook TOS and Community Standards and the Instagram TOU and Community Guidelines.  *Id.* ¶ 48.

26.     Between no later than March 2020 and October 2021, Defendants used their network of Chime-branded Facebook and Instagram accounts to impersonate Chime in violation of the Meta Terms.  *Id.* ¶ 49.

27.     Defendants used Chime-branded usernames, domains, and/or profile photos in connection with these accounts without Chime's authorization.  *Id.* ¶¶ 50, 51, 54.  For example, on July 28, 2020, Defendant Arowokoko created an Instagram account with the username "chim_45." *Id.* ¶ 50.  On the same day, Defendant Arowokoko changed the account's username to "_ch_im_e_" and used the Chime logo, without Chime's authorization, as the account's profile photo to advertise and promote purported online banking services.  *Id.*

28.     On July 28, 2020, Defendant Arowokoko used this account to post an image featuring Chime's logo and signature green color scheme as seen in Figure 4 in the Complaint, which was copied from Chime's official Instagram account, for the purpose of duping unsuspecting Instagram users into believing that Defendant Arowokoko's account was, in fact, a real Chime account or was otherwise authorized by Chime, when it was not.  *Id.* ¶ 51.

29.     On August 24, 2020, Meta disabled Defendant Arowokoko's "_ch_im_e_" account for violating the Instagram TOU and Community Guidelines.  *Id.* ¶ 52.

30.     Chime has also taken action to disable Defendant Arowokoko's unauthorized access to legitimate Chime member accounts.  *Id.* ¶ 53.

31.     On July 18, 2020, Defendant Opeyemi created an Instagram account with the username "chim_e55" and used the Chime logo, without Chime's authorization, as the account's profile photo to advertise and promote purported online banking services, as seen in Figure 5 in the Complaint.  *Id.* ¶ 54.

32.     On July 18, 2020, Defendant Opeyemi used this account to post an image featuring Chime's logo and signature green color scheme as seen in Figure 6 in the Complaint, which was copied from Chime's official Instagram account, for the purpose of duping unsuspecting Instagram users into believing that Defendant Opeyemi's account was, in fact, a real Chime account or was otherwise authorized by Chime, when it was not.  *Id.* ¶ 55.

33.     On July 19, 2020, Meta disabled Defendant Opeyemi's "chim_e55" account for violating Instagram's TOU and Community Guidelines.  *Id.* ¶ 56.

34.     Chime has also taken action to disable Defendant Opeyemi's unauthorized access to legitimate Chime member accounts.  *Id.* ¶ 57.

35.     Since June 2020, Meta has taken multiple enforcement actions against Defendants for violating the Meta Terms, including as recently as October 22, 2021.  *Id.* ¶ 58.  These include disabling Facebook and Instagram accounts and blocking Defendants' phishing websites from its services.  *Id.*  In addition, on July 9, 2021, Meta sent Defendants cease-and-desist letters notifying Defendants that their conduct violated the Meta Terms and revoked their access to Facebook and Instagram.  *Id.*

36.     Nonetheless, Defendants continued to create new Chime-impersonating accounts. *Id.* In total, between June 5, 2020, and October 22, 2021, Meta disabled more than 800 Facebook and Instagram accounts belonging to Defendants and blocked phishing websites associated with Defendants and their scheme from being accessed on Facebook and Instagram. *Id.* ¶ 59.

**D.     <u>Procedural Background</u>**

37.     On February 8, 2022, Plaintiffs filed their Complaint against Defendants Arowokoko and Opeyemi.  Dkt. No. 1.

38.     On September 7, 2022, the Court granted Plaintiffs leave to serve Defendant Arowokoko with process by email at qiawxn3554@camrew.com, and Defendant Opeyemi with process by email at lekkispender@gmail.com.  Dkt. No. 22 at 5.

39.     The Court found that "service via these email addresses is reasonably calculated to apprise Defendants of this lawsuit because these emails are likely associated with Defendants, the emails have recently been used in connection with Defendants' unlawful activity, and Plaintiffs have not been able to identify any physical locations where they could be served."  *Id.* at 5.

40.     On September 19, 2022, Plaintiffs effected service on Defendants in accordance with the Court's Order and filed a Certificate of Service with the Court.  Dkt. No. 25.

41.     Having been served on September 19, 2022, Defendants' responsive pleadings were due on October 11, 2022.  Fed. R. Civ. P. 12(a)(1)(A)(i).

42.     Defendants failed to meet that deadline.

43.     On October 18, 2022, Plaintiffs moved for entry of default under Federal Rule of Civil Procedure 55(a) and notified Defendants of the same via the above-referenced email addresses.  Dkt. No. 26.

44.     On October 20, 2022, the Clerk entered default.  Dkt. No. 29.

45.     To date, Defendants have not appeared in this action or otherwise demonstrated any intention to defend against Plaintiffs' claims.  Declaration of Caroline Y. Barbee ¶ 2.

/ / /

/ / /

/ / /

## II.     CONCLUSIONS OF LAW

### A.     The Court Has Subject Matter and Personal Jurisdiction

46.     Because Chime alleges federal trademark infringement under the Lanham Act, the Court has subject matter jurisdiction.  "As a result, the Court also has supplemental jurisdiction over [Plaintiffs'] related state law claims."  *Viet. Reform Party v. Viet Tan - Viet. Reform Party*, 416 F. Supp. 3d 948, 961 (N.D. Cal. 2019) (citing 28 U.S.C. § 1367); *see also* Compl. ¶ 9.

47.     This includes Meta's state law claim for breach of contract (Compl. ¶¶ 77-84), which arises out of the same common nucleus of operative facts as Chime's federal trademark claims: *i.e.*, all of the claims arise from Defendants' use of Facebook and Instagram accounts to impersonate Chime and lure Instagram users to Chime-branded phishing websites.  Compl. ¶ 44; *Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.*, 108 F. Supp. 3d 816, 823 (N.D. Cal. 2015) (court had supplemental jurisdiction over contract claim arising out of the same "common nucleus of operative facts" as infringement claims).

48.     The Court also has diversity jurisdiction under 28 U.S.C. § 1332.

49.     Complete diversity exists because Meta and Chime are citizens of California and Defendants Arowokoko and Opeyemi are citizens of Nigeria. Compl.  ¶¶ 3-6.

50.     The amount in controversy also exceeds $75,000.  *Id.* ¶ 10.

51.     Defendants consented to personal jurisdiction in this Court when they created and used Facebook and Instagram accounts and thereby agreed to the forum selection clauses in the Meta Terms requiring them to submit to the personal jurisdiction of this Court.  Compl. ¶¶ 11-13; Duffey Decl. ¶¶ 7, 10, Exs. 1-4, 18-20.  A forum selection clause is construed as consent by the parties to the personal jurisdiction of the courts of the selected forum.  *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 458 (9th Cir. 2007).

52.     Defendants agreed to the Meta Terms when they signed up for and used their Facebook and Instagram accounts to promote their fraudulent phishing scheme, and therefore agreed to litigate all claims brought by Meta in this Court.  Compl. ¶¶ 11-12, 20-26; *Facebook, Inc. v. Sluchevsky*, 2020 WL 5823277, at *2 (N.D. Cal. Aug. 28, 2020) (granting motion for default

1   judgment and enforcing Facebook's forum selection clause to exercise personal jurisdiction over

2   Ukrainian nationals in litigation initiated by Facebook).

3          53.     Defendants further consented to personal jurisdiction when they used websites,

4   mobile applications, and/or technology platforms offered, operated or made available by Chime,

5   and therefore also agreed to the Chime Terms of Use, which likewise contain a forum selection

6   clause requiring them to submit to the personal jurisdiction of this Court ("Chime TOU").  Compl. ¶

7   13.

8          54.     Although the forum selection clauses discussed above are sufficient to confer

9   jurisdiction, specific jurisdiction also exists based on Defendants' contacts with California.

10  Personal jurisdiction over a nonresident defendant is proper if permitted by a state's long-arm

11  statute and if its exercise would not violate federal due process.  *In re W. States Wholesale Nat'l*

12  *Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013).[1]  To satisfy due process, a nonresident

13  defendant must have minimum contacts with the forum such that asserting jurisdiction "does not

14  offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326

15  U.S. 310, 316 (1945) (citation omitted).

16         55.     Specific jurisdiction in California exists whenever a defendant: (1) purposefully

17  directed activities at California or its residents or performed some act by which they purposefully

18  availed themselves of the privilege of conducting activities in California; (2) at least one claim

19  arises out of or relates to those activities; and (3) the exercise of jurisdiction is reasonable.  *Brayton*

20  *Purcell LLP v. Recordon & Recordon*, 575 F.3d 981, 985 (9th Cir. 2009).  A plaintiff bears the

21  burden of satisfying the first two prongs of the test, and upon doing so, shifts the burden to the

22  defendant to set forth a "compelling case" that the exercise of jurisdiction would not be reasonable.

23  *See Giotta v. Ocwen Fin. Corp.*, No. 15-cv-00620-BLF, 2015 WL 8527520, at *3 (N.D. Cal. Dec.

24  11, 2015) (citation omitted); *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th

25  Cir. 2011).

26

27  [1] California's long-arm statute authorizes specific personal jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause of the United States Constitution.  *See*

28  *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).

56.    "[P]urposeful availment" and "purposeful direction" under the specific jurisdiction test are distinct concepts. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802-03 (9th Cir. 2004). A purposeful availment analysis is used in contract disputes; and a purposeful direction analysis is used in cases alleging tort claims. *Id.; see also Panavision Int'l*, 141 F.3d at 1321 (finding trademark case "akin to a tort case"). The Complaint in this case alleges both tort and contract claims. As to Meta's contract-based claim, this Court has personal jurisdiction over Defendants because they purposefully availed themselves of the privilege of conducting business in California; and as to Chime's tort-based claims, Defendants purposefully directed their activities at California. As to all claims, Defendants have not shown, and cannot show, unreasonableness.

57.    Defendants purposefully availed themselves of the benefits and protections of a California forum when Defendants knowingly directed and targeted their actions at California through their use of the services of Meta and Chime, which both have principal places of business in California. Compl. ¶¶ 3-4.

58.    Since at least March 2020, Defendants created and used multiple Facebook accounts and Instagram accounts. *Id.* ¶¶ 7, 48, 59. In total, Defendants controlled more than five Facebook accounts and more than 800 Instagram accounts across multiple devices. *Id.* ¶ 59.

59.    Each time Defendants created and used Facebook and Instagram accounts, they contracted with Meta in California and agreed to California law in the choice-of-law provision in the Meta Terms. *Id.* ¶¶ 11-12; Duffey Decl. ¶¶ 7, 10, Exs. 1-4, 18-20.

60.    Similarly, each time Defendants used websites, mobile applications, and/or technology platforms offered, operated or made available by Chime, they contracted with Chime in California and agreed to California law in the choice-of-law provision in Chime's TOU. *Id.* ¶ 12; *see also Google, Inc. v. Eolas Techs. Inc.*, Nos. 13-cv-05997-JST, 13-cv-06003-JST, 2014 WL 2916621, at *3 (N.D. Cal. June 24, 2014) (finding defendant's agreement to California choice-of-law provision evidenced purposeful availment); *Sluchevsky*, 2020 WL 5823277, at *3-4 (finding purposeful availment based, in part, on defendant's acceptance of California choice-of-law provision in Facebook Terms).

61.     Defendants' creation and use of the above-referenced Facebook and Instagram accounts created "ongoing obligations of both parties—'Facebook to allow [Defendants] to use its platform[s] . . . and [Defendants] to comply with Facebook's [terms]—[which] constitute a continuous course of dealing . . . that suffices to make a prima facie showing of purposeful availment." *Sluchevsky*, 2020 WL 5823277, at *3-4 (citation omitted).

62.     Defendants also purposefully directed their activities to California by transacting business and engaging in commerce in California.  *See Calder v. Jones*, 465 U.S. 783, 788-89 (1984); *see also Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (adopting the *Calder* "effects" test).

63.     Here, Defendants intentionally acted in a manner expressly aimed at California by impersonating Chime, a California-based financial company, to lure Instagram and Facebook users to Chime-branded phishing websites for the purpose of fraudulently accessing funds entrusted to Chime.  Compl. ¶¶ 1, 4, 14, 45.

64.     Further, the Chime-branded phishing websites Defendants used in the scheme used a U.S.-based domain registrar and hosting provider.  *Id.* ¶¶ 14, 39; *see also Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1093-94 (N.D. Cal. 2014) (finding purposeful direction where the defendant harmed "Yelp, a company he knew to be located in California, by . . . using Yelp's registered trademarks" and by "confusing [Yelp's] customers"); *Facebook, Inc. v. Banana Ads LLC*, No. CV 11-03619-YGR (KAW), 2013 WL 1873289, at *4 (N.D. Cal. Apr. 30, 2013) (finding purposeful direction where "Defendants targeted Facebook, a company they knew to be located in California, by registering infringing domain names similar to facebook.com, and using them to divert Internet users attempting to reach Facebook's website").

65.     The "arising from" requirement is satisfied here because Plaintiffs would not have been injured "but for" Defendants' forum-related activities, including (1) the duties Defendants undertook and breached when they contracted with Meta in order to impersonate Chime, and (2) Defendants' infringing use of California-based Chime's name and marks to lure Instagram and Facebook users, including users residing in California, to Chime-branded phishing websites for the purpose of fraudulently accessing funds entrusted to Chime.  Compl. ¶¶ 1, 4, 13-14, 42-43, 45; *See*

1   *Learjet Inc. v. Oneok, Inc.*, 715 F.3d 716, 742 (9th Cir. 2013); *see also, e.g.*, *Haisten v. Grass Valley*

2   *Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1400 (9th Cir. 1986) (finding "aris[ing] out of"

3   requirement satisfied because plaintiff's claim arose out of insurance contract between the

4   defendant and a third party, which constituted the defendant's contact with California).

5   66.   Moreover, Defendants expressly targeted California entities in Meta and Chime,

6   caused Meta and Chime to expend significant time and resources to combat the Defendants'

7   unlawful activity, and damaged the goodwill among Meta and Chime's users, all in a manner that

8   caused harm felt in California.  *See CollegeSource*, 653 F.3d at 1079 (noting that "a corporation

9   incurs economic loss, for jurisdictional purposes, in the forum of its principal place of business");

10  *Nissan Motor Co. v. Nissan Comput. Corp.*, 89 F. Supp. 2d 1154, 1160 (C.D. Cal. 2000)

11  (defendant's exploitation of plaintiffs' goodwill had effect of injuring plaintiff in California.).

12  67.   "Because the first two requirements for exercising specific personal jurisdiction

13  ha[ve] been established," Defendants must present a "compelling case" that the assertion of

14  jurisdiction would be unreasonable.  *See Yelp, Inc.*, 70 F. Supp. 3d at 1082, 1094.  Defendants

15  cannot present a "compelling case" because they have "waived [their] opportunity to make this

16  showing by failing to participate in this litigation."  *Id.*

17  68.   Further, because Defendants specifically targeted California companies through their

18  illicit activities and conducted business in California, Defendants "had 'fair warning' that [they]

19  might be sued in California."  *Id.* at 1094 (citation omitted).

20  69.   In addition, pendent personal jurisdiction is also proper as Meta's state law claim for

21  breach of contract arises out of the same common nucleus of operative facts as Chime's federal

22  trademark claims: *i.e.*, Defendants' use of Facebook and Instagram accounts to impersonate Chime

23  and lure Instagram users to Chime-branded phishing websites, such that the exercise of pendent

24  personal jurisdiction would be proper.  *Action Embroidery v. Atl. Embroidery*, 368 F.3d 1174, 1180-

25  81 (9th Cir 2004); *see also NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 827 (N.D. Cal.

26  2014) (exercising pendent personal jurisdiction over state law contract claims along with federal

27  tort-based claims because the claims were based on the same common factual predicates).

28

70.     As for service of process, this Court previously found that service of process by email on Defendant Arowokoko at qiawxn3554@camrew.com, and on Defendant Opeyemi at lekkispender@gmail.com was proper.  Dkt. No. 22.  The Defendants were served at those email addresses, per the Court's Order.  Dkt. No. 25.  Accordingly, service of process was proper.  *See Distinct Media Ltd. v. Shutov*, No. 15-cv-03312-NC, 2017 WL 1234400, at *3 (N.D. Cal. Mar. 10, 2017) (granting default judgment where court previously found that service of process was in compliance with Fed. R. Civ. P. 4(f)(2)(C)).

71.     After proper service, Defendants did not respond to the Complaint, and the Clerk entered default.  Dkt. No. 29.

**B.      <u>Defendants are Liable to Chime for Trademark Infringement, Counterfeiting, and Unfair Competition</u>**

72.     Chime is the owner of two federal trademark registrations covering the word mark CHIME, two applications covering the CHIME logo, and common law rights in and to the Chime Marks.  Compl. ¶¶ 34-36.  Chime's federal trademark registrations are "prima facie evidence of the validity of the [subject marks]," and "shift[] the burden" to Defendants to "introduce evidence sufficient to rebut the presumption of validity."  *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 13 F.3d 1297, 1301 (9th Cir.1994), *rev'd on other grounds by* 514 U.S. 159 (1995).  Defendants have submitted no evidence to rebut this presumption.

73.     To prevail on a claim of counterfeiting and trademark infringement, a holder of a registered service mark must show that the defendant is using: "(1) any reproduction, counterfeit, copy or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution or advertising of any goods; (5) where such use is likely to cause confusion, or to cause a mistake or to deceive."  *See Gucci Am. v. Wang Huoqing*, No. C-09-05969 JCS, 2011 WL 31191, at *9 (N.D. Cal. Jan. 3, 2011) (citing Lanham Act 15 U.S.C. § 1114(1)); *see also Microsoft Corp. v. Buy More, Inc.*, 703 F. App'x 476, 479 (9th Cir. 2017) (finding that marketing of counterfeit software as authentic established a likelihood of confusion); *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 945 (9th Cir. 2011)

1   (affirming the district court's finding that "[t]here is a likelihood of confusion . . . when the

2   offending mark is a counterfeit mark").

3           74.     The "test" for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C.

4   § 1125(a) is exactly the same as for trademark infringement: "whether the public is likely to be

5   deceived or confused by the similarity of the marks." *Century 21 Real Est. Corp. v. Sandlin*, 846

6   F.2d 1175, 1178 (9th Cir. 1988) (citation omitted).

7           75.     Defendants have used the Chime Marks in interstate commerce in connection with

8   the sale, offering for sale, distribution or advertising of services, as Defendants have made

9   unauthorized infringing use of the Chime Marks on phishing websites and on Facebook and

10  Instagram to falsely advertise and promote purported online banking services.  Compl. ¶¶ 45-47,

11  49-55.

12          76.     Chime has not consented to Defendants' use of the Chime Marks.  Compl. ¶¶ 45-47,

13  49-51, 54-55.

14          77.     This Circuit considers eight factors to determine whether a likelihood of confusion

15  exists: (1) the strength of the mark; (2) the relatedness of the goods or services; (3) the similarity of

16  the marks; (4) the evidence of actual confusion; (5) the marketing channels used; (6) the degree of

17  consumer care; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion.

18  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 350 (9th Cir. 1979).

19          78.     Courts have held that only factors relevant to the situation at hand need be

20  considered, as "[o]nly a subset of the *Sleekcraft* factors are needed to reach a conclusion as to

21  whether there is a likelihood of confusion." *Zest Anchors, LLC v. Geryon Ventures, LLC*, 2022 WL

22  2811646, at *15 (S.D. Cal. July 18, 2022).  However, the "similarity of the marks," "relatedness of

23  the goods" and "common marketing channel" factors are consistently given more weight than

24  others, "the controlling troika in the *Sleekcraft* analysis." *Id.*

25          79.     The Chime Marks are strong, both inherently and as a result of Chime's advertising

26  and promotional efforts and several years of substantially exclusive use.  Compl. ¶¶ 31-34.

27          80.     Defendants copied the Chime Marks wholesale, including Chime's logo and

28  signature green color. Defendants' phishing scheme, disguised as online banking services,

incorporates exact copies of the Chime logo and marks and advertises non-existent online banking services to consumers through channels that are identical to those used by Chime, including Instagram. *Id.* ¶¶ 43-47.

81.      Due to the identical nature of the marks, services and targeted audience, it is highly likely that consumers have fallen victim to Defendants' phishing scheme and have been misled as to the source of Defendants' purported online banking services. Compl. ¶¶ 44-45. "[W]here one produces counterfeit goods 'in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a ***presumption*** of a likelihood of confusion.'" *Id.* (emphasis added); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987); *see also Transgo, Inc. v. AJAC Transmission Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir. 1985).

82.      Since at least as early as March 2020, Defendants used a network of Instagram accounts to impersonate Chime by using the Chime logo, the word "Chime" in website URLs, and images copied directly from the official Chime website, to lure consumers to fake websites to input personal information. *Id.* "When [a defendant] knowingly adopts a mark similar to [the plaintiff's], reviewing courts presume that the defendant can accomplish [its] purpose: that is, that the public will be deceived." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1076 (9th Cir. 2006) (citation omitted).

83.      In consideration of the strength of the Chime Marks and Defendants' intentional and exact copying of the marks, a likelihood of confusion has been demonstrated and Defendants' infringing conduct fits squarely within the definition of federal counterfeiting, which is "'hard core' or 'first degree' trademark infringement . . . . 'that seeks to trick the consumer into believing he or she is getting the genuine article.'" *UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 607 (C.D. Cal. 2017) (citation omitted).

84.      Defendants' use of the Chime Marks is willful, in bad faith, and conducted with full knowledge of the goodwill and reputation associated with Chime with the intent to reap the benefits of the goodwill that Chime has created in its marks. Compl. ¶¶ 64-65.

85.     Defendants' actions constitute federal trademark infringement, counterfeiting and unfair competition. Any further use of these counterfeit marks by Defendants risks irreparable harm not only to Chime's marks and goodwill, but also to the consuming public.  Compl. ¶¶ 66, 72, 76.

**C.     Chime is Entitled to Permanent Injunctive Relief**

86.     "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Est. Corp.*, 846 F.2d at 1180-81; 15 U.S.C. § 1116(a).

87.     Under the Lanham Act, the Court has the "power to grant injunctions according to the rules of equity and upon such terms as the court may deem reasonable, to prevent violation" of Plaintiff's rights. *Viet. Reform Party*, 416 F. Supp. 3d at 971.

88.     A plaintiff is entitled to a permanent injunction in a trademark case when it demonstrates "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Facebook, Inc. v. Sahinturk*, 2022 WL 1304471, at *11 (N.D. Cal. May 2, 2022) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  As detailed below, Chime is entitled to a permanent injunction because all four requirements are satisfied.

89.     As to irreparable injury, the Lanham Act provides that "a plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction." *Sahinturk*, 2022 WL 1304471, at *11; *see also* 15 U.S.C. § 1116(a).  Because Defendants' actions constitute federal trademark infringement, counterfeiting and unfair competition, Chime is entitled to a rebuttable presumption of irreparable harm.

90.     In addition to presumed irreparable harm, Chime has suffered intangible injuries. The Ninth Circuit recognizes that "intangible injuries," including loss of goodwill, can constitute irreparable harm. *Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*, No. 5:20-cv-04773-EJD, 2020 WL 5199434, at *8 (N.D. Cal. Aug. 17, 2020) (citation omitted); *see also Rent-A-Ctr., Inc. v.*

*Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).  Chime has a high degree of consumer recognition within the fintech space and has built up a significant amount of goodwill in the Chime Marks, Compl. ¶¶ 31, 34.  Defendants have intentionally and unlawfully traded on that goodwill to deceive consumers, eroding Chime's goodwill in the Chime Marks.  *Id.* ¶¶ 64-65.  Accordingly, Chime has shown irreparable harm.

91.     Moreover, monetary damages are inadequate to prevent future infringement. The Defendants' failure to respond to or otherwise defend this action, or to provide assurances to the Court that they will no longer engage in infringing conduct, signifies that their infringement will continue regardless of the many time-consuming and expensive protective measures implemented by Chime.

92.     There is no evidence that Defendants will suffer any hardship apart from ceasing to profit from their unlawful conduct, which is not considered a hardship for purposes of granting a permanent injunction.  *See Cisco Sys., Inc.*, 2020 WL 5199434, at *9 ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.'" (quoting, *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) (superseded on other grounds)).

93.     Finally, granting a permanent injunction will serve the public interest in enforcing and protecting trademark holders' rights, and will further protect the integrity of Chime's business and its users whose confidential information is being misappropriated through infringement.  *See Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019) (holding that Facebook's ability to police the integrity of its platforms is "without question a pressing public interest").

94.     Accordingly, the requirements for a permanent injunction are met.

**D.     Defendant is Liable to Meta for Breach of Contract**

95.     To state a claim for breach of contract under California law, Meta need only allege facts showing: "(1) the existence of a contract; (2) plaintiff's performance or excuse for non-performance; (3) defendant's breach; and (4) damage to plaintiff resulting therefrom." *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1059 (N.D. Cal. 2010).

96.     Meta has satisfied all four elements.

97.     Valid contracts exist between Meta and Defendants. Defendants agreed to the Meta Terms by accessing and using Facebook and Instagram.  Compl. ¶¶ 11-12, 20-26*; See Facebook, Inc. v. Grunin*, 77 F. Supp. 3d 965, 970 (N.D. Cal. 2015) ("Grunin agreed to Facebook's Terms when he created a Facebook account and accessed Facebook's services."); *Yelp Inc.*, 70 F. Supp. 3d at 1099 ("Here, the Yelp terms of service is a contract."); *Craigslist, Inc.*, 694 F. Supp. 2d at 1059 ("Plaintiff has alleged that the TOUs existed as a valid contract between it and all users, including the Defendants.").

98.     Meta has "performed all conditions, covenants, and promises required of it in accordance with its agreements with Defendants" by allowing Defendants to use Facebook and Instagram, until Meta became aware that they were in breach of the Meta Terms.  Compl. ¶¶ 11-12, 20-26, 44-57, 81.  These allegations are sufficient under California law.  *See Yelp, Inc.*, 70 F. Supp. 3d at 1099 ("Yelp has performed all conditions, covenants, and promises required on its part in accordance with the terms of service."); *Craigslist, Inc.*, 694 F. Supp. 2d at 1059 ("Plaintiff performed by offering and allowing online posting for classified ads.").

99.     Defendants breached the Meta Terms by: (a) using their Facebook and Instagram accounts to impersonate Chime, mislead and defraud users, and infringe the intellectual property rights of Chime, in violation of Section 3.2.1 (a-c) of the Facebook TOS, Facebook Community Standards, the Instagram TOU, and Instagram Community Guidelines; (b) creating multiple Facebook accounts and continuing to use Facebook after Meta disabled their accounts for violating the Facebook TOS, in violation of Section 3.1 of the Facebook TOS; and (c) continuing to use Instagram after Meta disabled their account for violating the Instagram TOU, in violation of the Instagram TOU.  Compl. ¶¶ 20-29, 49-57, 80, and 83.

100.    Defendants' "many breaches have caused Meta to incur damages."  *Id.* ¶ 82. This allegation is sufficient to satisfy the fourth element for breach of contract under California law.  *See Yelp, Inc.*, 70 F. Supp. 3d at 1099 ("As a result of this breach, Catron has caused damage to Yelp."); *Craigslist Inc.*, 694 F. Supp. 2d at 1059 ("As a direct result of Defendants' actions, Plaintiff suffered monetary and other damages.").

**E.       Meta is Entitled to Permanent Injunctive Relief and Costs**

101.     "A plaintiff may . . . be entitled to injunctive relief for a breach of contract claim under California law," as long as the contract is one for which specific performance is an available remedy.  *See Twitch Interactive, Inc. v. Johnston*, No. 16-cv-03404-BLF, 2019 WL 3387977, at *12 (N.D. Cal. July 26, 2019); Cal. Civ. Code §§ 3422, 3423(e).  Here, specific performance is an available remedy under the Meta Terms. *See Facebook, Inc. v. Kokhtenko*, No. 21-cv-03036-YGR, 2022 WL 1195439, at *1 (N.D. Cal. Feb. 18, 2022) (granting default judgment on Facebook's breach of contract claim based on the defendant's violation of the Facebook TOS and Instagram TOU and issuing permanent injunction).

102.     Under California law, specific performance is available where the plaintiff shows: "(1) the inadequacy of his legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract." *Tamarind Lithography Workshop, Inc. v. Sanders*, 143 Cal. App. 3d 571, 575 (1983).

103.     Here, a legal remedy would be inadequate, including because Defendants have already created and used *more than 5 Facebook accounts and 800 Instagram accounts* to engage in unlawful activity, in breach of the Meta Terms.  Compl. ¶¶ 7, 48, 59. (emphasis added); *see* Cal. Civ. Code § 3422 (permitting a "final injunction" where "pecuniary compensation would not afford adequate relief"); *Grunin*, 77 F. Supp. 3d at 973 (finding irreparable harm where Facebook terminated more than seventy accounts associated with defendant).

104.     In addition, Defendants have demonstrated a pattern of creating new Instagram accounts after previously created accounts have been suspended or disabled, with the links between the accounts evidencing a pattern of recidivism and attempts to bypass Meta's prior enforcement efforts.  Compl. ¶ 2.  Given this pattern of recidivism, there is a high likelihood that, absent injunctive relief, Defendants will continue to breach the Meta Terms, which will require Meta to expend significant resources—indefinitely—to find and counteract their unlawful activity. Declaration of Andrew Herter ¶¶ 2-3.; *See, e.g.*, *Union Oil Co. of Cal. v. Greka Energy Corp.*, 165

Cal. App. 4th 129, 136 (2008) (where a party commits multiple breaches, specific performance is preferred over the inadequate remedy of repetitive future damage actions); *Tamarind Lithography*, 143 Cal. App. 3d at 575 (future contractual violations might be deemed a continuous breach creating danger of untold number of lawsuits).

105.    As noted above, Meta has established that the Meta Terms are valid and have been breached, evidencing that the second element of specific performance is met.  *See* Section II.D above; Compl. ¶¶ 17-18, 47, 80; *Grunin*, 77 F. Supp. 3d at 970 (defendant's creation and use of Facebook created a valid contract based on the Facebook terms, which was breached when defendant violated the same); *Sluchevsky*, 2020 WL 5823277, at *7 (same); *Tamarind Lithography*, 143 Cal. App. 3d at 575 (need for finding a contract reasonable and supported by adequate consideration is obviated where there has been a determination of the defendant's breach of that contract).

106.    The element of "requisite of mutuality of remedy has been satisfied in that [Meta] has fully performed [its] obligations pursuant to the agreement,"—i.e., it permitted Defendants to access and use Facebook and Instagram until it discovered they breached the Meta Terms.  *See* Compl. ¶¶ 44, 47-50, 86; *Henderson v. Fisher*, 236 Cal. App. 2d 468, 473 (1965) (holding for there to be "mutuality of remedies," the "contract must be subject to specific performance by both of the contracting parties"); *Tamarind Lithography*, 143 Cal. App. 3d at 577 ("The requisite of mutuality of remedy has been satisfied in that [the party seeking specific performance] had fully performed his obligations pursuant to the agreement . . . ."); *Facebook, Inc. v. Kokhtenko*, No. 21-cv-03036-YGR (LB), 2021 WL 7448619, at *6 (N.D. Cal. Dec. 3, 2021) (finding Facebook "performed all conditions, covenants, and promises required of it in accordance with their [user] agreements with Defendant" by allowing access and use of its platforms), *report and recommendation adopted*, No. 21-CV-03036-YGR, 2022 WL 1195439 (N.D. Cal. Feb. 18, 2022).

107.    The Meta Terms' terms are definite, and the requested injunction tracks the exact language of the Meta Terms, thereby satisfying the fourth and fifth elements of specific performance.  In particular, Meta seeks an order enjoining Defendants "and their agents, servants, employees, successors, and assigns, and all other persons acting in concert or conspiracy with any

of them or who are affiliated with Defendants from . . . [a]ccessing or attempting to access Meta's services, platforms, and computer systems, including Facebook and Instagram." Compl. at Request for Relief ¶ 2(a).

108. This relief is supported by the Meta Terms. The Facebook TOS provides that if Meta "determine[s] that you have clearly, seriously or repeatedly breached [the Facebook TOS] or Policies . . . [Meta] may suspend or permanently disable access to your account. [And] may also suspend or disable your account if you repeatedly infringe other people's intellectual property rights[.]" Duffey Decl., Exs. ¶ 7, Exs. 1-4.

109. Similarly, the Instagram TOU specifically provides that Meta "can refuse to provide or stop providing all or part of the [Instagram] Service to you (including terminating or disabling your access to the [Meta] Products and [Meta] Company Products) immediately . . . if you . . . violate [the Instagram TOU] or [Meta's] policies . . . [or] if you repeatedly infringe other people's intellectual property rights[.]" *Id.* ¶ 10, Exs. 18-20.

110. Defendants have not appeared in this action and have not established that they would suffer *any* hardship by being prohibited from using Facebook or Instagram in the future. *Twitch Interactive*, 2019 WL 3387977, at *11.

111. "[T]he public is not disserved by a permanent injunction, particularly because the public may have been deceived and harmed by [Defendants'] trademark infringement and offering of automated bots. As such, equity favors the entry of a permanent injunction against [Defendants]." *See id.* at *12; *see also Grunin*, 77 F. Supp. 3d at 973 ("[T]he public would not be disserved by prohibiting Grunin from posting . . . deceptive ads on Facebook.").

112. Based on the forgoing, Meta is entitled to the permanent injunction described below.

**III.    Order of Judgment**

113. Good cause appearing, it is hereby ordered and adjudged as follows:

   a.   Commencing on the "So Ordered" date of this Judgment and Permanent Injunction, Defendants Arafat Eniola Arowokoko and Arowokoko Afeez Opeyemi and their agents, servants, employees, successors, and assigns, and all other persons acting in concert or conspiracy with any of them or who are affiliated with Defendants who

receive actual notice of this Order, are hereby permanently enjoined and restrained from doing, or authorizing or procuring any persons to do, any of the following until such time as this Order is dissolved or modified by further Court order:

    i.   Accessing or attempting to access Meta's services, platforms, and computer systems, including Facebook and Instagram;

    ii.   Creating or maintaining any Facebook or Instagram accounts in violation of the Terms, including the Facebook TOS, Facebook Community Standards, Instagram TOU, and Instagram Community Guidelines;

    iii.   Engaging in any activity, or facilitating others to do the same, that violates the Terms, including the Facebook TOS, Facebook Community Standards, Instagram TOU, and Instagram Community Guidelines;

    iv.   Using any reproduction, counterfeit, copy, or colorable imitation of the Chime Marks, or any mark confusingly similar thereto, for or in connection with any goods or services not authorized by Chime;

    v.   Engaging in any course of conduct likely to cause confusion or deception, or to injure Chime's business reputation or the Chime Marks;

    vi.   Using any false description or representation, including words or other symbols falsely to describe or represent Defendants' unauthorized goods or services as Chime's, or as sponsored or associated with Chime, and from offering such fraudulent and illegitimate goods or services into commerce;

    vii.   Making any false or misleading representation of fact concerning their affiliation with Chime, including but not limited to representing falsely that they are Chime ambassadors or representatives;

    viii.   Distributing, circulating, marketing, offering, advertising, promoting, displaying or otherwise disposing of any products or services not authorized by Chime that bear any simulation, reproduction, counterfeit, copy, or colorable imitation of the Chime Marks;

ix.  Making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which is or may be likely to lead the trade or public, or individual members thereof, to believe that any alleged services offered or distributed by Defendants are in any manner associated or connected with Chime, or are licensed, sponsored, approved, or authorized by Chime;

x.  Creating, operating, owning, overseeing, or otherwise exercising control over any websites, social media, chat platforms or related apps that embed, incorporate, include, display or otherwise use in any manner any of the Chime Marks, variants thereof, or marks or designations confusingly similar thereto; and

xi.  Effecting assignments or transfers, or forming new accounts, entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in this Order, or any subsequent order or final judgment in this action.

b.  This Injunction shall apply throughout the world to the fullest extent of this Court's jurisdiction.

c.  This is a final judgment as to all claims asserted against Defendants Arafat Eniola Arowokoko and Arowokoko Afeez Opeyemi in this action.

d.  This Court shall retain jurisdiction for the purpose of making any further orders necessary or proper for the construction, modification, or enforcement of this Judgment and Permanent Injunction, and the punishment for any violations thereof.

e.  Service of this Judgment and Permanent Injunction on Defendants Arafat Eniola Arowokoko and Arowokoko Afeez Opeyemi shall be made in accordance with the Court's Order at Dkt. No. 22.

**IT IS SO ORDERED**.

DATED: _____

_____
HONORABLE DONNA M. RYU
United States Magistrate Judge